1  Nicholas F. Wasdin (*Pro Hac Vice forthcoming*)
   **DWOSKIN WASDIN LLP**
2  110 N. Wacker
   Chicago, Illinois 60606
3  Tel.: 312-343-5361
   nwasdin@dwowas.com
4
   Robert G. Loewy (SBN 179868)
5  **LAW OFFICES OF ROBERT G. LOEWY, P.C**
   20 Enterprise, Suite 310
6  Aliso Viejo, California 92656
   Tel.: 949-468-7150
7  rloewv@rloewv.com

8  *Counsel for Plaintiff and the Proposed Classes*

9

10                 UNITED STATES DISTRICT COURT

11               CENTRAL DISTRICT OF CALIFORNIA

12  JENNIFER ENDRES, individually and on )   Case No.:
    behalf of all others similarly situated,  )
13                                          )   CLASS ACTION COMPLAINT
                          Plaintiff,        )
14         vs.                              )   DEMAND FOR JURY TRIAL
                                            )
15  FITON INC,                              )
                                            )
16                        Defendant.        )
                                            )
17                                          )
                                            )
18                                          )

19  _____

20

21

22

23

24

25

26

27

28

- 1 -
CLASS ACTION COMPLAINT

Jennifer Endres ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint against FitOn Inc. ("FitOn" or "Defendant") for violations of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), and upon personal knowledge as to Plaintiff's own conduct, and on information and belief as to all other matters, including based on an investigation by counsel, alleges as follows:

## I.      NATURE OF THE ACTION

1.      This is a class action against FitOn for violating Plaintiff's privacy rights under federal law by knowingly disclosing consumers' personally identifiable information, including "information which identifies a person as having requested or obtained specific video materials or services from a video tape provider" ("PII"), through the use of a hidden tracking code created by Meta Platforms, Inc. (formerly known as Facebook) ("Meta") and integrated by FitOn into FitOn's online video service platforms.

2.      FitOn owns and operates a subscription-based online video streaming platform called "fitonapp.com" and related applications. FitOn subscribers can request and watch hundreds of fitness and wellness videos from their computer or mobile device.

3.      Unbeknownst to Plaintiff and members of the Class (defined below), FitOn knowingly and intentionally discloses its users' video viewing history every time they request or watch video content on fitonapp.com.

4.      FitOn shares its customers' PII with Meta for advertising and marketing purposes via certain "pixels" on their website.

5.      The "Meta Pixel" is a hidden tracking code incorporated into the FitOn platform that sends Meta time-stamped, personally-identifiable records of consumers, such as Plaintiff and Class members, including information which identifies a person as having requested or obtained specific video materials or services from FitOn.

6.      Meta combines this personal information with other information about

each consumer gathered from other sources and uses it for marketing and advertising purposes.

7.      FitOn is a "video tape service provider" under the VPPA.

8.      The VPPA prohibits "video tape service providers," such as FitOn, from knowingly disclosing "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider" absent informed, written consent and opt-out rights, which FitOn does not obtain or provide.

9.      FitOn violates the VPPA by sharing its users' video viewing histories with Meta via the Meta Pixel.

10.     Accordingly, Plaintiff brings this Class Action Complaint for legal and equitable remedies to compensate Plaintiff and members of the Class for Defendant's statutory violations and to end Defendant's practice of knowingly disclosing FitOn users' highly sensitive video viewing histories to third parties.

## II.   JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under the Video Privacy Protection Act, 18 U.S.C. § 2710.

12.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(d) because this is a class action in which the aggregate amount in controversy for the proposed Class exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from that of Defendant.

13.     Venue is appropriate in this District pursuant to 28 U.S.C. §1391 because, upon information and belief, (a) Defendant's principal place of business is located at 8605 Santa Monica Blvd., #16613, West Hollywood, California 90069, (b) Defendant does business in this District, (c) a substantial part of the events or omissions giving rise to the claim occurred in or emanated from this District, and (d) this Court has personal jurisdiction over Defendant.

## III.  PARTIES

14.     Plaintiff Jennifer Endres is a resident of Bakersfield, California.  Plaintiff

subscribed to FitOn from June 2023 to September 2023. Plaintiff paid for her subscription and also purchased additional video content from FitOn. Plaintiff has had a Facebook account for more than two years. During the relevant time period, Plaintiff requested and watched videos on FitOn while logged into her Facebook account. By doing so, Plaintiff's FitOn video viewing history was disclosed to third parties, including Meta, pursuant to the systematic process described herein. Plaintiff did not provide express written consent—in the form required by the VPPA—to the disclosure of her video viewing history.

15.    FitOn is a Delaware corporation with its principal place of business in West Hollywood, California.

**IV.    GENERAL FACTUAL ALLEGATIONS**

**A.    The Video Privacy Protection Act.**

16.    The VPPA generally prohibits the knowing disclosure of a customer's video viewing history without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." Under the statute, the Court may award actual damages (but not less than liquidated damages of $2,500.00), punitive damages, equitable relief, and attorney's fees.

17.    The VPPA was initially passed in 1988 for the explicit purpose of protecting the privacy of individuals' and their families' video rental, purchase and viewing data. Leading up to its enactment, members of the United States Senate warned that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." S. Rep. No. 100-599 at 7-8 (1988).

18.    Senators at the time were particularly troubled by disclosures of records that reveal consumers' purchases and rentals of videos and other audiovisual materials. As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in

sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7-8 (1988) (statements of Sens. Simon and Leahy, respectively).

19.    In proposing the Video and Library Privacy Protection Act (later codified as the VPPA), Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 Cong. Rec. S5399 (May 10, 1988). Thus, the personal nature of such information, and the need to protect it from disclosure, is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id*.

20.    While these statements rang true in 1988 when the VPPA was passed, the importance of legislation like the VPPA in the modern era of data mining from online activities is more pronounced than ever before. During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating that while "it is true that technology has changed" over the years, "we have to be faithful to our fundamental right to privacy and freedom," and "[t]oday the social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[1]

21.    In this case, Defendant deprived Plaintiff and the Class members of that right by knowingly and systematically disclosing their video viewing histories to

---

[1] *See* Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Senate Judiciary Committee Subcommittee on Privacy, Technology and the Law, https://www.govinfo.gov/content/pkg/CHRG-112shrg87342/html/CHRG-112shrg87342.htm (last visited October 20, 2023).

1  unauthorized third parties without obtaining informed written consent, as explained
2  herein.

3  **B.    FitOn Video Platform**

4      22.    FitOn owns and operates the FitOn platform, which includes their flagship
5  website, fitonapp.com, and the "FitOn" mobile application.

6      23.    FitOn offers a catalog of fitness and wellness courses and content for
7  consumers to watch and to motivate them to reach their fitness and wellness goals over
8  time.

9      24.    FitOn advertises itself as helping consumers "[t]ake [their] wellness to the
10  next level," including through: (a) "Fitness" to "[b]e more active and to reach [their]
11  goals with custom fitness programs;" (b) "Mindfulness" to "[r]educe stress and be more
12  mindful with meditation and yoga classes;" (c) "Nutrition" to "[e]at healthier with
13  personalized meal plans and 500+ exclusive recipes;" and (d) "Motivation" to "[m]ake
14  working out more fun and rewarding with challenges and the support of [their] friends."

15      25.    FitOn provides an online fitness community and related products,
16  services, content, and features.

17      26.    FitOn users get access to "[e]xclusive guided courses" that "target[] health
18  and chronic conditions including diabetes, heart health, MSK, fall prevention, sleep
19  and more."

20      27.    FitOn invites consumers to "[j]oin [their] 15 million+ member
21  community."

22      28.    To subscribe to FitOn, users are required to sign-up.

23      29.    FitOn users are required to register by inputting their name and email
24  address and creating a password.

25      30.    FitOn then sends users a verification email called a "[m]agic sign-in link"
26  with a code that expires within 24 hours.

27      31.    The sign-up process includes recommended video content, such as multi-
28  week fitness and nutrition programs, that are only accessible to users after signing-up.

32.    FitOn users can "favorite" programs or courses, receive advice, and invite friends and others to join FitOn.

33.    FitOn users are encouraged to join personalized, multiweek "challenges."

34.    FitOn user activity is tracked with a calendar.  Users whose activity merit positive reinforcement are encouraged with feedback, such as acknowledging that a user has hit a "streak."  User calorie counts, minutes logged in workout videos, and total workouts are all logged and prominently displayed to motivate and encourage users to continue using the platform.

35.    Users receive periodic emails from FitOn that are intended to promote use of the platform.

36.    The account allows users to access FitOn's exclusive and/or restricted content, products, and services, and to join the FitOn community. The account establishes a relationship with FitOn.  FitOn uses the account to establish a commitment between the user and the platform so that the user is motivated to continue using the platform to achieve their fitness and wellness goals, including over an extended (e.g., multi-week) period of time. FitOn uses the account to establish an association among new FitOn users and other members of the community that FitOn cultivates. FitOn provides users with many opportunities to express association with the platform through sharing video content and inviting others to join the community.

37.    The version of FitOn that is accessible to users with an account is not identical to the version of FitOn that is available to those who merely access the website through general internet browsing. Similarly, the content of electronic services available to accountholders is different than the information that is available to those who merely access the website through general internet browsing.

38.    Upon information, FitOn classifies users who have accounts differently than those who merely access the website through general internet browsing.  Indeed, FitOn classifies them as accountholders and/or subscribers and is able to monetize the relationship with accountholders in a manner that it is unable to do with those who

merely access the website through general internet browsing.

39.    Upon information and belief, access through an account by a user generates value for FitOn that mere website access by general internet browsers does not.

40.    FitOn also offers a "Pro" version for a fee and other content for payment. The Pro version offers additional features.

41.    After a user creates an account and begins using the FitOn platform, FitOn collects a wide variety of additional sensitive information about its users, including IP address, mobile device unique ID, user location, browser or device type, browser version, the time and date a user visits the FitOn platform, pages visited, the time spent on those pages, unique device identifiers, and other diagnostic data. FitOn also uses technologies (e.g., cookies) to store and/or access information on users' computers or devices in order to process personal data or browsing history. Cookies are small text files that are used as identifiers. FitOn transfers these text files to the hard drive of users' computers via the users' web browser and can read them during the users' use of the FitOn platform. The cookies allow FitOn to track information regarding how users use the FitOn platform, and allow FitOn to directly or indirectly identify the individual users. In that way, FitOn collects information that the user's browser sends whenever the user visits FitOn's service or when the user accesses the service by or through a mobile device. Additionally, while using the FitOn application on a mobile device, FitOn may collect, among other things: (a) information from the user's device's phone book (contacts list); and (b) pictures and other information from the user's device's camera and photo library.

42.    FitOn users can request and watch specific video materials through the FitOn platform, including on fitonapp.com.

43.    After a user requests specific video materials from FitOn, FitOn hosts and delivers prerecorded video content for the specific video content requested.

44.    The following is an example of the video content available on FitOn.



45.   The videos that FitOn hosts on its website are integral to its business model of providing fitness and wellness content to consumers.

**C.   The Meta Pixel.**

46.   The Meta Pixel is a "web beacon" that is used to track and disclose individuals' online activities to Meta.

47.   Meta is an advertising company that sells advertising space on the social media platform it operates, including Meta and Instagram.

48.   Meta calls itself a "real identity platform," meaning users are allowed only one account and must share the name they go by in everyday life. Users must provide Meta their first and last name to create an account.

49.   Meta's advertising is based on sophisticated user-categorizing and targeting capabilities that are fueled by the personal data of users of the social media platform and other Internet users.

50.   Meta surveils users' online activities both on and off Meta's own websites and apps, which allows Meta to make highly personal inferences about users, such as about their interests, behavior, and connections.

51.   Meta compiles information it obtains and infers about internet users and uses it to identify personalized audiences likely to respond to particular advertisers' messaging.

52.   The Meta Pixel is a free and publicly available piece of code that Meta

CLASS ACTION COMPLAINT

allows third-party website developers to install and integrate into their websites.

53.    The code that is used to execute the Pixel functions is written into the base code of the website.

54.    The Meta Pixel is installed on a website as a first-party cookie.

55.    Cookies are small pieces of text used to store information on web browsers. They store and receive identifiers and other information on computers, phones and other devices, and they can serve a number of different functions, such as personalizing content and tailoring and measuring ads.

56.    A "first-party cookie option" is designed to circumvent improvements in how web browsers block third-party cookies (a primary means by which Meta historically tracked people across the web).  Being embedded in websites as a first-party cookie, rather than as a third-party cookie, causes users' browsers to treat that Pixel as though it is offered by the website they are visiting, rather than by Meta, a third party.

57.    When the Pixel is embedded in a website as a first-party cookie, the third-party cookie blocking functions of modern web browsers do not inhibit the Meta Pixel's collection of data.

58.    Because of the Pixel design, the Pixel causes users' browsers to treat that Pixel as though it is offered by the website itself.

59.    From a technological perspective, the Pixel is a part of the code of the website, and a users' browser understands the Pixel to be a part of the website itself, not a third-party.

60.    The Meta Pixel is configured to capture a substantial amount of information by default.

61.    Since 2015 when it was introduced, the Meta Pixel has transmitted HTTP header information, including the URL of each page visited on a website, by default. HTTP Headers collect "IP addresses, information about the web browser, page location, document, referrer and persons using the website."

CLASS ACTION COMPLAINT

62.    Meta also automatically collects "Pixel-specific Data," which includes "the Pixel ID and cookie."

63.    For Meta account-holders, "Pixel-specific Data" includes the "c_user" cookie, which allows Meta to link data to a particular Meta account with a user ID (a "Meta ID").[2]

64.    The Meta ID is a unique and persistent identifier assigned to each Meta user.

65.    The c_user cookie is personally identifiable information because it contains a consumer's Meta ID. A Meta ID allows anybody—not just Meta—to identify the individual using a website with a Meta account. If anyone types www.facebook.com/[MetaID] into a web browser, it will load that individual's Meta page, which contains a person's name and often a person's photographs and location information.

66.    The Meta ID number is a number—just like a social security number, driver's license number, or telephone number—which can be used by anyone to identify an individual.

67.    A Meta ID is personally identifiable information. Anyone can identify a Meta profile—and all personal information publicly listed on that profile—by appending the Meta ID to the end of https://facebook.com.

68.    A website developer can also choose to track actions taken on their website with the Meta Pixel, called an "Event."  When a chosen action is taken, the Meta Pixel is triggered and sends Meta certain data.  Meta then attempts to match the Events it receives to Meta users.

69.    The developer can then create "Custom Audiences" based on Events and can target ads on Meta's platforms.

70.    Meta associates the information it obtains via the Meta Pixel with other

---

[2] The Meta ID is also sometimes called a Facebook ID. The terms are used synonymously herein.

CLASS ACTION COMPLAINT

1    information regarding the user, using personal identifiers that are transmitted
2    concurrently with other personal information the Pixel is configured to collect.

3    71.    Meta assigns a unique numerical identifier to each Meta Pixel and
4    maintains records associating each Pixel with the data it transmits and the website
5    where it is embedded.

6    **D.    FitOn Uses The Meta Pixel To Disclose Viewing Histories To Meta.**

7    72.    FitOn has integrated the Meta Pixel throughout its website.

8    73.    The numerical identifier associated with the Meta Pixel which currently
9    operates on fitonapp.com is 1394702670665430.

10    74.    Below is a screenshot of what the consumer sees when viewing the FitOn
11    workout number "22." The URL identifies the subject matter of the video (i.e., that it
12    is a "workout" video) and the specific reference number assigned to the video by FitOn
13    ("22"). In this example, video "22" relates to a category of workout called a high-
14    intensity interval training ("HIIT") pilates.



23    75.    The specific reference number assigned to videos by FitOn (in the above
24    example, "22") are unique identification numbers that an ordinary person can use to
25    access the entirety of the video content by simply appending the reference number to
26    the end of the FitOn URL (i.e., https://app.fitonapp.com/browse/[subject/numeric-
27    video-title]). Thus, the video reference number (a) identifies the specific video, and (b)
28    can be used to by an ordinary person to access the entirety of the referenced video.

76.    The below screenshot shows that FitOn shares with Meta via the Meta
Pixel data that is tied to unique identifiers that identify specific consumers with specific
video content. The recipients of the data—e.g., Meta—receive both the specific video
content requested (workout "22") *and* a unique individual identifier (the individual's
Facebook ID), all as part of a single data transmission, as shown in the following screen
shot.



77.    When a user begins watching the video, the end of FitOn URL transitions
from "browse/workout/22" to "inprogress/22," thus indicating that the user has
transitioned from requesting to obtaining the video content at issue. The below
screenshot shows that FitOn discloses this data to Meta via the Meta Pixel, thus telling
Meta that a specific FitOn user has begun to watch the specific video content.



78.    FitOn also shares with Meta via the Meta Pixel an "Event" called

CLASS ACTION COMPLAINT

"PageView" that tells Meta, among other data points, the page that the consumer is viewing on fitonapp.com. The "PageView" Event tells Meta the specific URL of the page the consumer visited, including the subject matter and title of the specific video materials or services selected for viewing.



79.    FitOn also shares with Meta via the Meta Pixel an "Event" called "Button Click" that tells Meta, among other data points, the buttons that the consumer clicks on while viewing videos on the FitOn platform, including to start or pause the video.  Upon information and belief, this data allows Meta to see precisely how and when a specific user viewed and interacted with the specific video content at issue. The screenshot below illustrates that FitOn shares the "Button Click" Event.



80.    The above screenshots are but examples for one particular workout video

CLASS ACTION COMPLAINT

(workout "22"). The following screenshots are examples of similar data transfers for other videos—here, a different HIIT workout, and a daily yoga video—with different video reference numbers.





81.   In addition to the videos available to be viewed as part of a standard user subscription, FitOn also offers additional video content for individual purchase. When a user purchases individual video content from FitOn, the data transferred to Meta via the Meta Pixel discloses the specific video purchase made by the specific FitOn user.

82.   On information and belief, at all relevant times FitOn understood the functionality of the Meta Pixel—including that it enabled FitOn to show targeted advertising to its subscribers based on their video viewing history—and thus knew that the Meta Pixel disclosed FitOn users' individual video viewing histories to Meta.

83.   Tracking pixels such as the Meta Pixel are not necessary for Defendant to

operate FitOn's video streaming platform and are instead used for the sole purpose of enabling targeted advertising to Defendant's benefit.

84.    As a result of Defendant's data compiling and sharing practices, Defendant has knowingly disclosed to Meta and other third parties for its own personal profit the video viewing histories of FitOn's users.

85.    By disclosing its users' video viewing histories to unauthorized third parties—which undeniably reveals their identity and the specific video materials they requested from Defendant's website—Defendant has intentionally and knowingly violated the VPPA.

## V.    CLASS ALLEGATIONS

86.    Plaintiff brings this action individually and on behalf of all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3), on behalf of the following class (the "Class"):

> During the fullest period allowed by law, all persons residing in the United States who: (a) have a FitOn account; and (b) requested or viewed video content through the FitOn platform, including through fitonapp.com or the FitOn application.

87.    Specifically excluded from the Class are: (1) Defendant, any entity in which Defendant has a controlling interest, and its past or current legal representatives, officers, directors, employees, assigns and successors; (2) the Judge to whom this case is assigned and any member of the Judge's staff or immediate family; and (3) Class Counsel.

88.    Plaintiff reserves the right to modify, change, or expand the Class definition based upon discovery and further investigation.

89.    Numerosity: Members of the Class are so numerous and geographically dispersed that joinder of all members of the Class is impracticable. Plaintiff believes that there are hundreds of thousands of Class members dispersed throughout the United

CLASS ACTION COMPLAINT

States. Class Members are readily identifiable from information in Defendant's records.

90. <u>Typicality</u>: Plaintiff's claims are typical of the claims of members of the Class. Plaintiff and members of the Class were harmed by the same wrongful conduct by Defendant in that Defendant caused FitOn users' video viewing histories to be disclosed to third parties without obtaining express written consent in a manner that complies with the VPPA and without the requisite opt-out rights. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

91. <u>Commonality/Predominance</u>: Common questions of law and fact exist as to all Class members. These questions predominate over questions that may affect only individual Class members because Defendant acted on grounds generally applicable to all Class members. Such common legal or factual questions include, *inter alia*:

      a) whether Defendant disclosed Class members' video viewing histories to Meta or other third parties;

      b) whether the information Defendant disclosed to Meta or other third parties constitutes personally identifiable information under the VPPA;

      c) whether Defendant's disclosure of Class members' video viewing histories to third parties was knowing under the VPPA;

      d) whether Class members consented to Defendant's disclosure of their video viewing histories in a manner that complies with the VPPA; and

      e) whether the Class is entitled to damages or other relief under the VPPA as a result of Defendant's conduct.

92. <u>Adequate Representation</u>: Plaintiff will fairly and adequately protect the interests of the Class. By prevailing on her own claims, Plaintiff will establish Defendant's liability as to all Class members. Plaintiff's counsel are unaware of any conflicts of interest between Plaintiff and absent Class members with respect to the

CLASS ACTION COMPLAINT

matters at issue in this litigation; Plaintiff will vigorously prosecute the suit on behalf of the Class; and Plaintiff is represented by attorneys with substantial experience in complex and class action litigation, including in class action privacy litigation. Plaintiff's attorneys have investigated the claims in this action and have committed sufficient resources to represent the Class.

93.    <u>Injunctive/Declaratory Relief</u>: The elements of Rule 23(b)(2) are met. Declaratory and injunctive relief is appropriate in this matter. Defendant has acted or refused to act on grounds generally applicable to Plaintiff and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described herein, with respect to the Class members as a whole. Unless a class-wide injunction is issued, Defendant will continue to disclose FitOn user's sensitive video viewing histories to third parties as described throughout this Complaint, and members of the Classes will continue to be harmed and denied their rights under the law.

94.    <u>Superiority</u>: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, Class members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of their individual claims, it is likely that few Class members could afford to seek legal redress for Defendant's misconduct. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent or varying adjudications with respect to individual members of the Class and/or Defendant.  The benefits of proceeding through the class mechanism substantially outweighs any potential difficulties in management of this class action.

CLASS ACTION COMPLAINT

95.    Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

96.    Plaintiff reserves the right to seek certification of Rule 23(c)(4) of common questions related to Defendants' knowledge, conduct, and duties.

**VI.    CAUSE OF ACTION**

## COUNT 1

**Violation Of The Video Privacy Protection Act 18 U.S.C. § 2710**

97.    Plaintiff incorporates the allegations contained in the above paragraphs of this complaint as though fully set forth herein.

98.    The VPPA prohibits a "video tape service provider" from knowingly disclosing "personally-identifying information" concerning any consumer to a third-party without the "informed, written consent (including through an electronic means using the Internet) of the consumer." 18 U.S.C § 2710.

99.    As defined in 18 U.S.C. § 2710(a)(4), a "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audiovisual materials."

100.    Defendant is a "video tape service provider" as defined in 18 U.S.C. § 2710(a)(4) because it engaged in the business of delivering prerecorded video materials to FitOn users.

101.    Defendant's business includes delivering FitOn users' specific video content hosted on the FitOn platform.

102.    As defined in 18 U.S.C. § 2710(a)(3), "personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."

103.    Defendant knowingly caused information which identifies Plaintiff and Class members as having requested or obtained specific video materials or services to be disclosed to third parties. This information constitutes personally identifiable

information under 18 U.S.C. § 2710(a)(3) because it identified Plaintiff and each Class member to third parties as an individual who requested or obtained specific video materials on the FitOn platform.

104.   As defined in 18 U.S.C. § 2710(a)(1), a "consumer" means "any renter, purchaser, or subscriber of goods or services from a video tape service provider." As alleged in the preceding paragraphs, Plaintiff is a "consumer" under the VPPA.

105.   Defendant failed to obtain informed, written consent from Plaintiff and other Class members for the disclosures described above in a manner that satisfies 18 U.S.C. § 2710(b)(2)(B).

106.   Defendant knew that Plaintiff's and Class members' personally-identifiable information protected under the VPPA was disclosed to third parties, because, *inter alia*, Defendant chose, programmed, and intended for those third parties to receive the video content requested or obtained and the digital subscribers' specific Facebook ID.

107.   By disclosing Plaintiff's and the Class's personally-identifiable information protected under the VPPA, Defendant violated Plaintiff's and the Class members' statutorily protected right to privacy in their video-watching habits. *See* 18 U.S.C. § 2710(c).

108.   As a result of the above violations, Defendant is liable to the Plaintiff and other Class members for actual damages related to their loss of privacy in an amount to be determined at trial or alternatively for "liquidated damages not less than $2,500" per violation. Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by the Defendant in the future.

## VII.   PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the other members of the proposed Class, respectfully requests that the Court enter judgment against Defendant as follows:

A.     An order certifying the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4), designating Plaintiff as the named representative of the Class, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate;

B.     An order declaring that Defendant's conduct as described herein violates the VPPA, 18 U.S.C. § 2710(c)(2)(D);

C.     Awarding to Plaintiff and each Class member at least $2,500.00 per violation, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

D.     Awarding punitive damages, as warranted, in an amount to be determined at trial, 18 U.S.C. § 2710(c)(2)(B);

E.     Awarding restitution and all other forms of equitable monetary relief, 18 U.S.C. § 2710(c)(2)(D);

F.     Awarding attorneys' fees and costs, as allowed by law, 18 U.S.C. § 2710(c)(2)(C);

G.     Awarding pre-judgment and post-judgment interest, as provided by law;

H.     An order enjoining Defendant from continued violations of the VPPA as alleged herein, 18 U.S.C. § 2710(c)(2)(D);

I.     Such other relief as may be appropriate under the circumstances.

## VIII.     JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  February 27, 2024          **DWOSKIN WASDIN LLP**
**LAW OFFICES OF ROBERT G. LOEWY, P.C**


By:_____*/s/Robert G. Loewy*_____
Robert G. Loewy

*Counsel for Plaintiff and the Proposed Classes*

- 21 -